**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBERTO MEDINA, derivatively on behalf of MODERNA, INC., <br><br> Plaintiff, <br><br> vs. <br><br> STEPHANE BANCEL, JAMES M. MOCK, STEPHEN HOGE, NOUBAR AFEYAN, SANDRA HORNING, ELIZABETH NABEL, FRANCOIS NADER, PAUL SAGAN, ELIZABETH TALLETT, ROBERT LANGER, and STEPHEN BERENSON, <br><br> Defendants, <br><br> and <br><br> MODERNA, INC., <br><br> Nominal Defendant. | Case No.: 1:24-cv-12483 <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> JURY TRIAL DEMANDED |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Roberto Medina ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Moderna, Inc. ("Moderna" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Stephane Bancel ("Bancel"), James M. Mock ("Mock"), Stephen Hoge ("Hoge"), Noubar Afeyan ("Afeyan"), Sandra Horning ("Horning"), Elizabeth Nabel ("Nabel"), Francois Nader ("Nader"), Paul Sagan ("Sagan"), Elizabeth Tallett ("Tallett"), Robert Langer ("Langer"), and Stephen Berenson ("Berenson") (collectively, the "Individual Defendants," and together with Moderna, the

"Defendants") for breaches of their fiduciary duties as directors and/or officers of Moderna, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, for violations of Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Bancel, Mock, and Hoge for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Moderna, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Moderna's current and/or former directors and officers from January 18, 2023 through June 25, 2024, both dates inclusive (the "Relevant Period").

2.      Moderna is a biotechnology company that represents itself to be "a leader in the creation of the field of mRNA medicines" focused on "reimagining how medicines are made and transforming how we treat and prevent disease for everyone."[1] The Company largely focuses on developing therapeutics and vaccines for the treatment of infectious diseases, immuno-oncology,

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001682852/000130817924000208/lmrna2024_def14a.htm

rare diseases, autoimmune, and cardiovascular diseases, including one of the earliest COVID-19 vaccines.

3.    One of Moderna's products is mRESVIA (mRNA-1345), which is an mRNA respiratory syncytial virus ("RSV") vaccine formulated with the goal of protecting adults aged 60 years and over from RSV-induced lower respiratory tract disease.

4.    On January 17, 2023, the Company published a press release during post-market hours titled "Moderna Announces mRNA-1345, an Investigational Respiratory Syncytial Virus (RSV) Vaccine, Has Met Primary Efficacy Endpoints in Phase 3 Trial in Older Adults." In relevant part, the press release stated the following:

> Moderna [. . .] today announced positive topline data from its ConquerRSV Phase 3 pivotal efficacy trial of mRNA-1345, an investigational mRNA vaccine targeting respiratory syncytial virus (RSV) in older adults. ***Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy endpoints have been met, including vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms.*** Based on these results, Moderna intends to submit for regulatory approval in the first half of 2023.[2]

5.    In July 2023, the Company began a rolling submission of a Biologics License Application ("BLA") to the U.S. Food and Drug Administration ("FDA") for real-time review of mRNA-1345. This initiated the process by which Moderna could submit completed sections of its BLA for review by the FDA before all sections became available. The Company represented that mRNA-1345 was backed by late-stage data which demonstrated a vaccine efficacy rate of 83.7% as defined by two or more RSV-related lower respiratory tract symptoms.

6.    However, in reality, mRNA-1345 was far less effective at treating RSV than Defendants continuously represented throughout the Relevant Period, and far less effective than

---

[2] All emphasis has been added unless otherwise noted herein.

some of the existing RSV vaccines developed by the Company's competitors.

7.     The truth began to emerge on May 31, 2024 when the Company published a press release "announc[ing] that the [FDA] has approved mRESVIA (mRNA-1345) . . . to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection." However, the press release revealed for the first time ***a vaccine efficacy of only 78.7%***, which was significantly below the 83.7% vaccine efficacy rate that the Company had previously identified in its July 2023 BLA rolling submission to the FDA.

8.     Analysts responded negatively to this news, with *Reuters*, in an article titled "US FDA approves Moderna's RSV vaccine with lower-than-expected efficacy in its label," reporting the following, in relevant part:

> The U.S. Food and Drug Administration approved Moderna's (MRNA.O), opens new tab respiratory syncytial virus (RSV) vaccine, the company announced on Friday, giving it a shot at much-needed new revenue from a second product.
>
> Moderna's vaccine was approved for the prevention of RSV-associated lower respiratory tract disease in adults aged 60 or older, ***but with a label indicating the shot was 79% effective at preventing at least two symptoms of RSV, such as cough and fever***.
>
> Moderna had filed for FDA approval in July on data from a late-stage trial that showed its vaccine was 84% effective at preventing those symptoms, and its shares were down more than 6% in afternoon trading.

9.     On this news, the price per share of the Company's stock fell $8.94, or 5.9%, from a closing price of $151.49 on May 30, 2024 to close at a price of $142.55 on May 31, 2024.

10.     The truth fully emerged on June 26, 2024 when the Company presented before the CDC's Advisory Committee on Immunization Practices. During the presentation, the Company revealed that after 18 months, mRNA-1345 proved only 49.9% to 50.3% effective against multiple symptoms of lower respiratory tract disease, which fell significantly lower than the efficacy rate for vaccines produced by the Company's competitors.

11. Analysts again responded negatively to these disclosures, with *Reuters* reporting, in an article titled "Moderna says its RSV shot is 50% effective across a second season," the following, in relevant part:

> Moderna [. . .] opens new tab respiratory syncytial virus (RSV) shot mRESVIA showed 50% efficacy in preventing RSV after 18 months, the drugmaker said on Wednesday.
> In their clinical trials, GSK's RSV vaccine Arexvy was 78% effective in preventing severe RSV over a second year and Pfizer's was 78% effective through a second RSV season.
>
> Moderna presented the data at a meeting of the U.S. Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices. The drugmaker has previously cautioned against comparing its vaccine to rivals, noting that the trials were not head-to-head and used different case definitions for RSV disease.

12. On this news, the price per share of the Company's common stock fell $15.15, or 11.01%, from a closing price of $137.60 per share on June 25, 2024 to close at a price of $122.45 per share on June 26, 2024.

13. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Moderna, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

15. In addition, during the Relevant Period, the Individual Defendants breached their

fiduciary duties by causing Moderna to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between January 2023 and June 2024, approximately 8,048,761 shares of Moderna common stock were repurchased, costing the Company **over $1.1 billion**. As the Company's stock was actually worth only $122.45 per share, the price at which it was trading when markets closed on June 26, 2024, the Company overpaid for repurchases of its own stock by **over $166.3 million** in total. Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, four of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of **over $326 million**.

16.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

17.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its President to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual

Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendant Bancel's, Mock's, and Hoge's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), Section 20(a) of the Exchange Act, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District,

one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

**PARTIES**

**Plaintiff**

24.    Plaintiff is a current shareholder of Moderna. Plaintiff has continuously held Moderna common stock since first purchasing the stock on May 27, 2020.

**Nominal Defendant Moderna**

25.    Moderna is a Delaware corporation with its principal executive offices at 325 Binney Street, Cambridge, Massachusetts 02142. Moderna's common stock trades on the NASDAQ Capital Market ("NASDAQ") under the ticker symbol "MRNA."

**Defendant Bancel**

26.    Defendant Bancel has served as the Company's CEO since October 2011 and as a Company director since March 2011.

27.    For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Bancel received $17,068,514 in total compensation from the Company. This included $1,563,462 in salary, $1,913,625 in non-equity plan incentive compensation, $3,129,194 in stock awards, $9,387,713 in option awards, and $1,074,520 in all other compensation.

28.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bancel made the following sales of Company stock:

| DATE | # OF SHARES SOLD | AVG. PRICE PER SHARE($) | PROCEEDS ($) |
|------|------------------|-------------------------|--------------|
|      |                  |                         |              |

| | | | |
|---|---|---|---|
| 2023-06-15 | 40,000 | 127.90 | 5,116,000 |
| 2023-06-14 | 40,000 | 126.22 | 5,048,920 |
| 2023-06-15 | 40,000 | 127.90 | 5,116,000 |
| 2023-06-14 | 40,000 | 126.22 | 5,048,920 |
| 2023-06-08 | 40,000 | 124.44 | 4,977,720 |
| 2023-06-07 | 40,000 | 126.12 | 5,044,800 |
| 2023-06-01 | 40,000 | 127.22 | 5,088,920 |
| 2023-05-31 | 40,000 | 127.09 | 5,083,480 |
| 2023-05-31 | 40,000 | 127.09 | 5,083,480 |
| 2023-06-01 | 40,000 | 127.22 | 5,088,920 |
| 2023-05-24 | 40,000 | 132.01 | 5,280,520 |
| 2023-05-25 | 40,000 | 127.77 | 5,110,920 |
| 2023-05-17 | 40,000 | 125.17 | 5,006,640 |
| 2023-05-18 | 40,000 | 124.36 | 4,974,400 |
| 2023-05-11 | 40,000 | 127.98 | 5,119,080 |
| 2023-05-10 | 40,000 | 132.41 | 5,296,520 |
| 2023-05-04 | 40,000 | 135.52 | 5,420,680 |
| 2023-05-03 | 40,000 | 131.42 | 5,256,799 |
| 2023-04-26 | 40,000 | 131.96 | 5,278,520 |
| 2023-04-27 | 40,000 | 131.16 | 5,246,280 |
| 2023-04-20 | 40,000 | 142.80 | 5,712,000 |
| 2023-04-19 | 40,000 | 142.83 | 5,713,320 |

| | | | |
|---|---|---|---|
| 2023-04-13 | 40,000 | 161.26 | 6,450,280 |
| 2023-04-12 | 40,000 | 157.15 | 6,285,880 |
| 2023-04-06 | 40,000 | 156.87 | 6,274,960 |
| 2023-04-05 | 40,000 | 154.69 | 6,187,600 |
| 2023-03-30 | 40,000 | 148.69 | 5,947,519 |
| 2023-03-29 | 40,000 | 148.92 | 5,956,799 |
| 2023-03-22 | 40,000 | 150.35 | 6,014,000 |
| 2023-03-23 | 40,000 | 150.11 | 6,004,520 |
| 2023-03-09 | 40,000 | 139.71 | 5,588,320 |
| 2023-03-08 | 40,000 | 141.47 | 5,658,800 |
| 2023-03-02 | 40,000 | 137.79 | 5,511,600 |
| 2023-03-01 | 40,000 | 135.70 | 5,428,000 |
| 2023-02-22 | 40,000 | 159.07 | 6,362,720 |
| 2023-02-23 | 40,000 | 147.00 | 5,880,080 |
| 2023-02-16 | 40,000 | 173.08 | 6,923,080 |
| 2023-02-15 | 40,000 | 175.26 | 7,010,320 |
| 2023-02-09 | 40,000 | 167.02 | 6,680,800 |
| 2023-02-08 | 40,000 | 167.16 | 6,686,520 |
| 2023-02-01 | 40,000 | 171.40 | 6,855,960 |
| 2023-02-02 | 40,000 | 173.57 | 6,942,720 |

| 2023-01-26 | 40,000 | 190.62 | 7,624,880 |
| 2023-01-25 | 40,000 | 191.97 | 7,678,720 |

Thus, in total, before the fraud was exposed, he sold 1,760,000 shares of Company stock on inside information, for which he received approximately $254,066,917 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29. The Schedule 14A the Company filed with the SEC on March 21, 2024 (the "2024 Proxy Statement") stated the following about Defendant Bancel:

> Mr. Bancel has served as our CEO since October 2011. Before joining Moderna, Mr. Bancel served for five years as CEO of the French diagnostics company bioMérieux SA. From July 2000 to March 2006, he served in various roles at Eli Lilly and Company, including as Managing Director, Belgium, and as Executive Director, Global Manufacturing Strategy and Supply Chain. Prior to Eli Lilly, Mr. Bancel served as Asia-Pacific Sales and Marketing Director for bioMérieux. He is currently a Venture Partner at Flagship Pioneering. In 2024, Mr. Bancel was elected to the National Academy of Engineering.

**Defendant Afeyan**

30. Defendant Afeyan cofounded Moderna and has served as Chairman of the Company since 2012 and as a Company director since 2010. He also serves as the Chair of the Nominating and Corporate Governance Committee.

31. For the 2023 Fiscal Year, Defendant Afeyan received $663,519 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $381,269 in option awards, and $132,250 in all other compensation.

32. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Afeyan made the following sales of

Company stock:

| DATE | # OF SHARES SOLD | AVG. PRICE PER SHARE($) | PROCEEDS ($) |
|---|---|---|---|
| 2024-06-18 | 15,000 | 134.30 | 2,014,545 |
| 2024-06-12 | 15,000 | 146.92 | 2,203,785 |
| 2024-06-11 | 202,832 | 148.85 | 30,191,340 |
| 2024-06-05 | 15,000 | 150.66 | 2,259,840 |
| 2024-05-29 | 20,000 | 144.42 | 2,888,440 |
| 2024-05-22 | 15,000 | 154.27 | 2,314,050 |
| 2024-05-15 | 15,000 | 127.55 | 1,913,250 |
| 2023-07-19 | 15,000 | 125.16 | 1,877,385 |
| 2023-07-12 | 15,000 | 125.91 | 1,888,575 |
| 2023-07-05 | 15,000 | 125.84 | 1,887,585 |
| 2023-06-14 | 15,000 | 126.73 | 1,901,025 |
| 2023-06-07 | 15,000 | 126.17 | 1,892,610 |
| 2023-05-31 | 15,000 | 127.70 | 1,915,440 |
| 2023-03-01 | 10,000 | 139.00 | 1,390,000 |
| 2023-02-22 | 10,000 | 160.35 | 1,603,500 |
| 2023-02-15 | 10,000 | 173.17 | 1,731,699 |
| 2023-02-08 | 20,000 | 166.92 | 3,338,420 |
| 2023-01-25 | 10,000 | 194.33 | 1,943,300 |
| 2023-01-18 | 10,000 | 200.20 | 2,002,000 |

Thus, in total, before the fraud was exposed, he sold 457,832 shares of Company stock on inside

information, for which he received approximately $67,156,789 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

33.     The 2024 Proxy Statement stated the following about Defendant Afeyan:

Dr. Afeyan founded Flagship Pioneering, a company established in 1999 that creates bioplatform companies to transform human health and sustainability, and serves as its Senior Managing Partner and Chief Executive Officer. He has served on the boards of numerous privately and publicly held companies. Dr. Afeyan entered biotechnology during its emergence as an academic field and industry, completing his doctoral work in biochemical engineering at MIT in 1987. He was a senior lecturer at MIT's Sloan School of Management where he taught courses on technology-entrepreneurship, innovation and leadership from 2000 to 2016, a lecturer of business administration at Harvard Business School until 2020, and he currently serves as a member of the MIT Corporation. In 2022, Dr. Afeyan was elected to the National Academy of Engineering.

**Defendant Horning**

34.     Defendant Horning has served as a Company director since 2020 and also serves as the Chair of the Product Development Committee and as a member of the Science and Technology Committee and the Nominating and Corporate Governance Committee.

35.     For the 2023 Fiscal Year, Defendant Horning received $481,269 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $381,269 in option awards.

36.     The 2024 Proxy Statement stated the following about Defendant Horning:

Dr. Horning was the Chief Medical Officer and Global Head of Product Development of Roche, Inc., from 2014 until her retirement in 2019, and, prior to that, served as Global Head of Oncology Clinical Science at Roche from 2009 to 2013. Prior to Roche, Dr. Horning spent 25 years as a practicing oncologist, investigator and tenured Professor of Medicine at Stanford University School of Medicine, where she remains a Professor of Medicine Emerita. From 2005 to 2006, she served as President of the American Society of Clinical Oncology. From 2015 to 2018, Dr. Horning served on the Foundation Medicine Board of Directors.

**Defendant Nabel**

37.     Defendant Nabel has served as a Company director since 2020 and also serves as the Chair of the Science and Technology Committee and as a member of the Compensation and Talent Committee and the Product Development Committee.

38.     For the 2023 Fiscal Year, Defendant Nabel received $476,245 in total compensation from the Company. This included $95,000 in fees earned or paid in cash, $95,262 in stock awards, and $285,983 in option awards.

39.     The 2024 Proxy Statement stated the following about Defendant Nabel:

From 2010 to 2021, Dr. Nabel served as the President of Harvard University-affiliated Brigham Health, which includes Brigham and Women's Hospital, Brigham and Women's Faulkner Hospital, and the Brigham and Women's Physician Organization. Dr. Nabel was also a Professor of Medicine at Harvard Medical School from 2010 to 2021. Following her retirement from Brigham Health, Dr. Nabel served as Executive Vice President for Strategy at ModeX Therapeutics, from 2021 to 2022, when the company was acquired by OPKO Health, Inc. Following the acquisition, Dr. Nabel also served as Chief Medical Officer for OPKO Health until August 2023. She now serves as the Chair of the Advisory Board of OPKO Health. Earlier in her career, Dr. Nabel held a variety of roles, including Director, at the National Heart, Lung and Blood Institute at the National Institutes of Health, a federal agency funding research, training and education programs to promote the prevention and treatment of heart, lung and blood diseases, from 1999 to 2009. She is an elected member of the National Academy of Medicine of the National Academy of Sciences.

**Defendant Nader**

40.     Defendant Nader has served as a Company director since 2019 and also serves as the Chair of the Compensation and Talent Committee and as a member of the Product Development Committee and the Science and Technology Committee.

41.     For the 2023 Fiscal Year, Defendant Nader received $481,269 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $381,269 in option awards.

42.     The 2024 Proxy Statement stated the following about Defendant Nader:

Dr. Nader served as President, CEO and Executive Director of NPS Pharmaceuticals from 2008 until 2015, when the company was acquired. During his tenure as CEO, Dr. Nader transformed NPS Pharma into a leading global biotechnology company focused on delivering innovative therapies to patients with rare diseases. From September 2023 to January 2024, Dr. Nader served as the acting Chief Executive Officer of BenevolentAI while the company conducted a CEO search. Prior to NPS, Dr. Nader was a venture partner at Care Capital. He previously served on Aventis Pharma's North America Leadership Team, holding a number of executive positions in integrated healthcare markets and medical and regulatory affairs. Dr. Nader previously led global commercial operations at the Pasteur Vaccines division of Rhone-Poulenc. He is a senior advisor for Blackstone Life Sciences. Dr. Nader is the former Chairman of BioNJ, New Jersey's biotechnology trade organization, and previously served on the board of the Biotechnology Industry Organization.

**Defendant Sagan**

43.     Defendant Sagan has served as a Company director since 2018 and also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.

44.     For the 2023 Fiscal Year, Defendant Sagan received $461,269 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $381,269 in option awards.

45.     The 2024 Proxy Statement stated the following about Defendant Sagan:

Mr. Sagan is a Catalyst Advisor at General Catalyst, a venture capital firm, which he first joined in 2013 and became a Managing Director in 2018. From 2005 to 2013, Mr. Sagan served as CEO at Akamai Technologies, Inc. and was President from 1999 to 2010 and from October 2011 to 2013. Prior to joining Akamai, Mr. Sagan held senior management roles at Time Warner, where he helped to found RoadRunner, the world's first consumer broadband service; Pathfinder, one of the first web portals that pioneered internet advertising; and NY1, the 24-hour cable news channel.

**Defendant Tallett**

46.     Defendant Tallett has served as a Company director since 2020 and also serves as the Chair of the Audit Committee and as a member of the Compensation and Talent Committee.

47.     For the 2023 Fiscal Year, Defendant Tallett received $481,269 in total

compensation from the Company. This included $100,000 in fees earned or paid in cash and $381,269 in option awards.

48.     The 2024 Proxy Statement stated the following about Defendant Tallett:

Ms. Tallett has spent more than 35 years in strategic leadership and operational roles in worldwide biopharmaceutical and consumer products industries. From 2002 to 2015, she was a Principal of Hunter Partners, LLC, a management company for pharmaceutical, biotechnology and medical device companies, and continues to consult with early-stage healthcare companies. She previously served as President and Chief Executive Officer of Transcell Technologies Inc., President of Centocor Pharmaceuticals, a member of the Parke-Davis Executive Committee, and Director of Worldwide Strategic Planning for Warner-Lambert Company. Ms. Tallett was a founding member of the Biotechnology Council of New Jersey and chairs the board of trustees at Solebury School in Pennsylvania. She was named a Financial Times Outstanding Director of the year in 2015 and recognized as one of the National Association of Corporate Directors (NACD) Directorship 100 honorees in 2019.

**Defendant Langer**

49.     Defendant Langer cofounded Moderna and served as a Company director from 2010 until he resigned in July 2024.

50.     For the 2023 Fiscal Year, Defendant Langer received $461,269 in total compensation from the Company. This included $80,000 in fees earned or paid in cash and $381,269 in option awards.

51.     The 2024 Proxy Statement stated the following about Defendant Langer:

Dr. Langer has been an Institute Professor at the Massachusetts Institute of Technology (MIT) since 2005, and has been a Professor at MIT since 1977. Dr. Langer served as a member of the Science Board to the U.S. Food and Drug Administration from 1995 to 2002, including as chairman for four years. He is an elected member of the National Academy of Sciences, the National Academy of Engineering, the National Academy of Medicine and the National Academy of Inventors. Dr. Langer has written over 1,550 articles and also has 1,450 issued or pending patents worldwide. Dr. Langer's patents have been licensed or sublicensed to over 400 pharmaceutical, chemical, biotechnology and medical device companies.

**Defendant Berenson**

52.    Defendant Berenson served as a Company director from 2017 until he resigned in July 2024.

53.    For the 2023 Fiscal Year, Defendant Berenson received $471,245 in total compensation from the Company. This included $90,000 in fees earned or paid in cash, $95,262 in stock awards, and $285,983 in option awards.

54.    The 2024 Proxy Statement stated the following about Defendant Berenson:

Mr. Berenson is a Managing Partner at Flagship Pioneering. He oversees Flagship's capital formation and business development activities, is deeply involved in firm-wide strategy and the firm's talent agenda and is a member of the firm's resource allocation committee. Prior to joining Flagship, Mr. Berenson spent 33 years as an investment banker at J.P. Morgan. During his last twelve years at J.P. Morgan, Mr. Berenson was Vice Chairman of Investment Banking and focused on providing high-touch strategic advice to leading companies across all industries globally. He was co-founder of J.P. Morgan's Global Strategic Advisory Council and co-founder of the firm's Board Initiative.

**Defendant Mock**

55.    Defendant Mock has served as the Company's CFO since September 2022.

56.    For the 2023 Fiscal Year, Defendant Mock received $4,317,185 in total compensation from the Company. This included $792,308 in salary, $583,200 in non-equity plan incentive compensation, $1,460,282 in stock awards, $1,460,295 in option awards, and $21,100 in all other compensation.

57.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mock made the following sales of Company stock:

| DATE | # OF SHARES SOLD | AVG. PRICE PER SHARE($) | PROCEEDS ($) |
|---|---|---|---|
| 2024-06-03 | 691 | 140.72 | 97,237 |
| 2024-05-29 | 183 | 144.50 | 26,444 |

| DATE | | | |
|------|---|---|---|
| 2024-05-28 | 648 | 162.47 | 105,283 |

Thus, in total, before the fraud was exposed, he sold 1,522 shares of Company stock on inside information, for which he received approximately $228,964 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

58.     The 2024 Proxy Statement stated the following about Defendant Mock:

Mr. Mock oversees Moderna's accounting, financial planning and analysis, business development, treasury, real estate, investor relations, internal audit and tax functions.

Before joining Moderna in September 2022, he was employed by PerkinElmer from 2018 to 2022 as Senior Vice President and Chief Financial Officer. Mr. Mock joined PerkinElmer from General Electric, where he served in a number of positions between 1999 and 2018, most recently as Vice President, Corporate Audit Staff.

**Defendant Hoge**

59.     Defendant Hoge has served as the Company's President since February 2015 after joining the Company in January 2013.

60.     For the 2023 Fiscal Year, Defendant Hoge received $7,339,166 in total compensation from the Company. This included $1,042,308 in salary, $850,500 in non-equity plan incentive compensation, $2,711,792 in stock awards, $2,711,966 in option awards, and $22,600 in all other compensation.

61.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hoge made the following sales of Company stock:

| DATE | # OF SHARES SOLD | AVG. PRICE PER SHARE($) | PROCEEDS ($) |
|------|------------------|-------------------------|--------------|

| | | | |
|---|---|---|---|
| 2024-06-17 | 15,000 | 138.16 | 2,072,400 |
| 2024-06-03 | 339 | 140.72 | 47,704 |
| 2024-05-29 | 341 | 144.50 | 49,276 |
| 2023-06-15 | 15,000 | 125.93 | 1,888,950 |
| 2023-06-02 | 309 | 130.32 | 40,269 |
| 2023-05-30 | 1,181 | 124.95 | 147,568 |
| 2023-05-10 | 250 | 133.37 | 33,343 |
| 2023-03-02 | 1,177 | 136.43 | 160,582 |
| 2023-03-01 | 1,072 | 138.03 | 147,962 |
| 2023-02-10 | 245 | 163.90 | 40,155 |

Thus, in total, before the fraud was exposed, he sold 34,914 shares of Company stock on inside information, for which he received approximately $4,628,209 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

62.     The 2024 Proxy Statement stated the following about Defendant Hoge:

Dr. Hoge oversees Moderna's research & development efforts, from basic science through clinical development and regulatory approvals. He also oversees early commercial efforts for many of our pipeline programs.

Before joining Moderna in January 2013, he was employed by McKinsey & Company from 2005 to 2012, in roles of increasing responsibility, most recently as a Partner and a leader in the firm's healthcare practice. Dr. Hoge was a resident physician from 2004 to 2005 at New York University/Bellevue Hospital.

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

63.     By reason of their positions as officers and/or directors of Moderna and because of their ability to control the business and corporate affairs of Moderna, the Individual Defendants

owed Moderna and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Moderna in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Moderna and its shareholders so as to benefit all shareholders equally.

64. Each director and officer of the Company owes to Moderna and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Moderna, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

66. To discharge their duties, the officers and directors of Moderna were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Moderna, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised Moderna's Board at all relevant times.

68.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

69.     To discharge their duties, the officers and directors of Moderna were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Moderna were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Moderna's own Code of Ethics and Business Conduct ("Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Moderna conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Moderna and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Moderna's operations would comply with all applicable laws and Moderna's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70.     Each of the Individual Defendants further owed to Moderna and the shareholders the duty of loyalty requiring that each favor Moderna's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position,

influence or knowledge of the affairs of the Company to gain personal advantage.

71.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Moderna and were at all times acting within the course and scope of such agency.

72.     Because of their advisory, executive, managerial, and directorial positions with Moderna, each of the Individual Defendants had access to adverse, non-public information about the Company.

73.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Moderna.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

74.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

75.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

76.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority

of the Board, each of the Individual Defendants who is a director of Moderna was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

77.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Moderna and was at all times acting within the course and scope of such agency.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79.     Moderna is a biotechnology company that represents itself to be "a leader in the creation of the field of mRNA medicines" focused on "reimagining how medicines are made and transforming how we treat and prevent disease for everyone."[3] The Company largely focuses on developing therapeutics and vaccines for the treatment of infectious diseases, immuno-oncology, rare diseases, autoimmune, and cardiovascular diseases, including one of the earliest COVID-19 vaccines. One of Moderna's products is mRESVIA (mRNA-1345), which is an mRNA RSV vaccine formulated with the goal of protecting adults aged 60 years and over from RSV-induced

---

[3]

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001682852/000130817924000208/lmrna2024_def14a.htm

lower respiratory tract disease.

**False and Misleading Statements**

*January 17, 2023 Press Release*

80.    On January 17, 2023, the Company published a press release during post-market hours titled "Moderna Announces mRNA-1345, an Investigational Respiratory Syncytial Virus (RSV) Vaccine, Has Met Primary Efficacy Endpoints in Phase 3 Trial in Older Adults." In relevant part, the press release stated the following:

> Moderna [. . .] today announced positive topline data from its ConquerRSV Phase 3 pivotal efficacy trial of mRNA-1345, an investigational mRNA vaccine targeting respiratory syncytial virus (RSV) in older adults. ***Following review by an independent Data and Safety Monitoring Board (DSMB), the primary efficacy endpoints have been met, including vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms.*** Based on these results, Moderna intends to submit for regulatory approval in the first half of 2023.

> "Today's results represent an important step forward in preventing lower respiratory disease due to RSV in adults 60 years of age and older. These data are encouraging, and represent the second demonstration of positive phase 3 trial results from our mRNA infectious disease vaccine platform after, Spikevax, our COVID-19 vaccine. We look forward to publishing the full data set and sharing the results at an upcoming infectious disease medical conference," said [Defendant] Bancel[.] "Respiratory diseases are a major public health priority given they have a significant health impact and are a leading cause of hospitalization. For these reasons, in addition to our mRNA-1345 RSV vaccine candidate, we are committed to developing a portfolio of respiratory mRNA vaccines to target the most significant viruses causing respiratory disease, including COVID-19, influenza, and human metapneumovirus."

*January 30, 2023 Press Release*

81.    On January 30, 2023, the Company published a press release titled "Moderna Granted FDA Breakthrough Therapy Designation for mRNA-1345, An Investigational Respiratory Syncytial Virus (RSV) Vaccine Candidate." In relevant part, the press release stated:

> Moderna [. . .] today announced mRNA-1345, an investigational mRNA vaccine candidate for respiratory syncytial virus (RSV), has been granted Breakthrough Therapy Designation by the U.S. Food and Drug Administration (FDA) for the

prevention of RSV-associated lower respiratory tract disease (RSV-LRTD) in adults aged 60 years or older. The designation was based on positive topline data from the ConquerRSV Phase 3 pivotal efficacy trial.

"The FDA's Breakthrough Designation for mRNA-1345 further emphasizes the significant health impact of RSV in older adults and the high unmet need," said [Defendant] Bancel[.] "With this designation, we look forward to productive conversations with the FDA in the hopes of bringing our RSV vaccine candidate for older adults to the market safely and quickly. Moderna's mRNA platform has now demonstrated two positive Phase 3 infectious disease trial results and we continue to advance a portfolio of respiratory mRNA vaccines targeting the most serious diseases. We are grateful to the FDA for this designation."

The FDA's Breakthrough Therapy Designation is granted to expedite the development and review of drugs that are intended to treat a serious condition, and when preliminary clinical evidence indicates the drug or vaccine may demonstrate substantial improvement over available therapy on a clinically significant endpoint(s).

### February 23, 2023 Press Release and Earnings Call

82.     On February 23, 2023, the Company published a press release announcing its

financial results for the fourth quarter and full year 2022. In relevant part, the press release stated:

"2022 was another impressive year for Moderna, with over $19 billion in revenue and significant clinical breakthroughs across our portfolio. We continue to provide our Omicron-targeting bivalent vaccines worldwide, with the latest real-world evidence highlighting the continued protection of our vaccines against hospitalization and death," said [Defendant] Bancel[.] "Our infectious disease platform continues to progress with positive Phase 3 data in RSV for older adults.

We are investing to scale Phase 3 manufacturing for personalized cancer vaccines so that we can run several Phase 3 studies simultaneously. With planned R&D investments of $4.5 billion for the year, I am excited about the new medicines we believe we will bring to patients in the coming few years."

***

*- RSV vaccine in older adults (mRNA-1345) met its primary efficacy endpoint and received Breakthrough Therapy Designation from FDA. mRNA-1345 demonstrated vaccine efficacy of 83.7% against RSV lower respiratory tract disease, defined by 2 or more symptoms, and 82.4% with 3 or more symptoms in older adults*. mRNA-1345 was generally well-tolerated, with no safety concerns identified by the Data Safety Monitoring Board (DSMB). Based on these results, Moderna expects to submit a Biologics License Application (BLA) for mRNA-1345 to the FDA in the first half of 2023. The pediatric Phase 1 trial of mRNA-1345 is fully enrolled.

83.     The same day, the Company hosted an earnings call with analysts and investors to discuss Moderna's financial results for the fourth quarter and full year 2022 (the "4Q22 Earnings Call"). Defendant Hoge stated the following during the scripted portion of the call, in relevant part:

> And moving to RSV, as you know, we shared the top line results from our Phase 3 RSV study in older adults earlier this year. And today, we shared additional data that was presented this morning at RSVVW. ***The top line results we have seen are incredibly encouraging and we are grateful to the FDA for breakthrough therapy designation for mRNA-1345, which further emphasizes the significant health impact of RSV in older adults and the high unmet need. In the top line data presented in January, the mRNA-1345 demonstrated 83.7% vaccine efficacy and the primary endpoint of lower respiratory tract disease with two or more symptoms***. 1345 was found to be generally well tolerated and there were no safety concerns identified by the Data and Safety Monitoring Board.

***February 24, 2023 Form 10-K***

84.     On February 24, 2023, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Bancel, Mock, Afeyan, Berenson, Horning, Langer, Nader, Nabel, Sagan, and Tallett and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bancel and Mock representing that "the information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

85.     With respect to Moderna's strategy, the 2022 10-K stated the following, in relevant part:

> We believe that the development of mRNA medicines represents a significant breakthrough for patients, our industry and human health globally. Our success in developing a highly effective vaccine against COVID-19, going from sequence selection, conducting clinical trials and to receipt of regulatory authorization for emergency use, all in less than a year, and subsequently receiving BLA approval from the FDA, provides a visible example of the promise of mRNA medicine. The Moderna COVID-19 Vaccine/Spikevax has been authorized for use or approved in over 70 countries. As our first approved product, Spikevax has helped hundreds of millions of people worldwide combat the COVID-19 pandemic. We believe our

success in developing our COVID-19 vaccines has positive implications beyond infectious disease vaccines and across our entire pipeline. We currently have 48 programs in development, and our pipeline spans infectious diseases, including vaccines against respiratory diseases, latent diseases and public health pathogens, as well as four therapeutic areas: immuno-oncology, rare diseases, cardiovascular diseases and autoimmune diseases.

In order to deliver on the full scope of the mRNA opportunity and maximize long-term value for patients and investors, we have formulated strategic priorities that guide our near-term and long-term goals:

1.**Execute our commercialization plans for our COVID-19 vaccines.** Our COVID-19 vaccines have been approved in more than 70 countries. We are transitioning to prepare for an endemic, commercial market for COVID-19 vaccines in the United States and other countries. We are working to build a differentiated commercial model, with active commercial subsidiaries across North America, Europe and the Asia-Pacific region, providing us with local commercial teams in key markets around the world.

2.**Build an unrivaled seasonal respiratory vaccine franchise.** As we build our respiratory franchise, we are applying our experience and using our mRNA platform to develop medicines that can help prevent hospitalizations and deaths from the most prevalent respiratory viruses. We are currently developing vaccines against COVID-19, seasonal flu and RSV individually, while pursuing parallel development of combination vaccines. In January 2023, we announced that our older adult RSV vaccine candidate had met its primary efficacy endpoints in a Phase 3 trial. Our long-term vision is to develop, and seek regulatory approval for, a convenient, annual, single-dose booster against as many respiratory viruses as possible. mRNA vaccines have the ability to combine multiple different antigens into one vaccine. We believe that combination vaccines have the potential to improve health outcomes at lower costs due to higher compliance, better uptake, a larger benefit to the healthcare system (including through reduced vaccine administration costs) and increased consumer convenience. We have preparations underway for multiple potential vaccine launches globally over the next several years.

86.     The 2022 10-K also provided an overview of mRNA-1345, stating the following,

in relevant part:

> *We are developing an RSV vaccine for children and adults. In older adults, mRNA-1345 reported positive topline Phase 3 efficacy results in January 2023; in pediatrics, mRNA-1345 is ongoing in a Phase 1 study.*
> ***
> mRNA-1345 encodes an engineered form of the RSV F protein stabilized in the prefusion conformation and is formulated in our proprietary LNP. We believe that

neutralizing antibodies elicited by mRNA-1345 may lead to an efficacious RSV vaccine.

*Latest data and next steps*

In January 2023, we announced that mRNA-1345 had met primary efficacy endpoints in the pivotal Phase 3 trial in older adults, ages 60 and older. mRNA-1345 demonstrated vaccine efficacy (VE) of 83.7% (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms. The other primary efficacy endpoint against RSV-LRTD defined by three or more symptoms was also met, with a VE of 82.4% (96.36% CI: 34.8%, 95.3%; p=0.0078). mRNA-1345 was generally well-tolerated with no safety concerns identified by the DSMB. The overall rate of severe (Grade 3 or greater) solicited systemic adverse reactions was 4.0% for mRNA-1345 and 2.8% for placebo. The overall rate of Grade 3 or greater solicited local adverse reactions was 3.2% for mRNA-1345 and 1.7% for placebo. The study is ongoing, and an updated analysis of safety and tolerability will be provided at the time of regulatory submission.

Based on the positive topline data from the pivotal Phase 3 efficacy trial, the FDA granted mRNA-1345 Breakthrough Therapy Designation for the prevention of RSV-LRTD in adults 60 years or older. We intend to submit mRNA-1345 to the FDA for regulatory approval for older adults in the first half of 2023.

### March 15, 2023 Proxy Statement

87.     On March 15, 2023, Moderna filed the 2023 Proxy Statement with the SEC. Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett, solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

88.     The 2023 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Berenson, Horning, and Sagan to the Board; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; and (3) ratify the selection of Ernst & Young LLP ("EY") as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

89.     In a section titled "Board's Role in Risk Oversight," the 2023 Proxy Statement

stated the following, in relevant part:

> Our Board is responsible for overseeing risk management. It exercises its oversight primarily through its committees. The full Board (or the appropriate committee for risks that are under the purview of a particular committee) discusses with management our major risk exposures, their potential impact, and the steps we take to manage them. The Board must satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as intended. When a Board committee is responsible for evaluating and overseeing the management of a particular risk, the Chair of that committee reports on it to the full Board at regular meetings so the Board can coordinate the risk oversight role among the relevant parties.
>
> ***
> ### Audit Committee
> ### Primary Risk Oversight
> - The integrity of Moderna's financial statements and related disclosures.
> - Moderna's internal control over financial reporting and policies relating to risk assessment and management.
> - Moderna's major financial risk exposures and steps taken to monitor and control such exposures, including overseeing treasury and tax operations.
> - Policies and procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or auditing matters, and whistleblower complaints.
> - Internal audit and compliance functions.
> - Information security and technology risks, including cybersecurity and related risk management programs.

90.     In a section titled "Governance Documents," the 2023 Proxy Statement stated:

> We have adopted a Code of Ethics and Business Conduct that applies to our Board of Directors and all of our officers and employees. In addition, we have adopted Corporate Governance Guidelines that formalize certain fundamental board policies and practices. Both of these documents are available on the "Investors— Governance—Governance Documents" section of our website, https://investors.modernatx.com.

91.     Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially

false and misleading and/or lacked a reasonable basis at all relevant times.

92.     The 2023 Proxy Statement was also false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

93.     As a result of Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Berenson, Horning, and Sagan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; and (3) appoint EY as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

### *April 11, 2023 Press Release*

94.     On April 11, 2023, Moderna published a press release titled "Moderna Announces Clinical and Program Updates at 4th Vaccines Day." In relevant part, the press release stated the following:

**mRNA-1345**

mRNA-1345, Moderna's RSV vaccine candidate, is in an ongoing Phase 2/3, randomized, observer-blind, placebo-controlled case-driven trial (ConquerRSV) in adults aged 60 years and older. In this study, 35,541 participants from 22 countries were randomized 1:1 to receive one dose of mRNA-1345 or placebo.

Following review by an independent Data and Safety Monitoring Board (DSMB),

the primary efficacy endpoints have been met, ***including vaccine efficacy (VE) of 83.7%*** (95.88% CI: 66.1%, 92.2%; p<0.0001) against RSV-associated lower respiratory tract disease (RSV-LRTD) as defined by two or more symptoms. Vaccine efficacy was maintained in participants over 70 years of age and participants with comorbidities. mRNA-1345 was well tolerated; solicited adverse reactions were mostly grade 1 or grade 2 in severity. No cases of Guillain-Barre Syndrome (GBS) have been reported.

mRNA-1345 has been granted Breakthrough Therapy Designation (BTD) by the FDA for the prevention of RSV-LRTD in adults aged 60 years or older.

***May 4, 2023 Earnings Call***

95.     On May 4, 2023, the Company hosted an earnings call with analysts and investors to discuss Moderna's financial results for the first quarter of 2023 ("1Q23") (the "1Q23 Earnings Call"). Defendant Hoge spoke during the scripted portion of the call, stating the following, in relevant part:

> Moving to RSV, we're pleased by the profile of our vaccine in older adults with high and consistent efficacy against RSV lower respiratory tract disease across populations in our large Phase 3 study.
>
> ***At two recent medical meetings, we've shared data showing our vaccine's efficacy was consistently high across all age groups, including in the oldest adult and in participants with preexisting comorbidities that put them at higher risk***. mRNA-1345 has also shown a favorable tolerability profile with AEs mostly grade 1 or grade 2, mild to moderate. As we shared during Vaccines Day, today, we have not seen any cases of Guillain-Barré syndrome or other severe demyelinating events in the trial.

***July 5, 2023 Press Release***

96.     On July 5, 2023, Moderna published a press release titled "Moderna Announces Global Regulatory Submissions For Its Respiratory Syncytial Virus (RSV) Vaccine, MRNA-1345." In relevant part, the press release stated:

> "We are proud to announce these filings for the use of our RSV vaccine candidate, mRNA-1345, in the European Union, Switzerland, Australia, and the U.S. RSV is a major cause of lower respiratory tract infections in older adults and can cause a significant burden to health systems through hospitalizations and emergency care admissions," said [Defendant] Bancel[.] "Our mRNA platform has allowed us to

move from initial clinical testing to our first international Phase 3 trial to initiation of regulatory submissions for mRNA-1345 in just two years, enabling us to tackle this pervasive public health burden with speed and clinical rigor. mRNA-1345 represents the second product coming from our mRNA platform to seek global approval, and with recent positive data in rare disease and cancer, we expect more in the future - further demonstrating the tremendous potential of mRNA to combat disease."

97.    In addition, the press release emphasized that "mRNA-1345 met primary efficacy endpoints, demonstrating vaccine efficacy of *83.7%* against RSV lower respiratory tract disease in older adults in the Phase 3 pivotal efficacy trial[.]"

***August 3, 2023 Press Release and Earnings Call***

98.    On August 3, 2023, the Company published a press release announcing Moderna's financial results for the second quarter of the 2023 Fiscal Year ("2Q23"). In relevant part, the press release stated the following:

> "Second quarter sales were on target, given the seasonal nature of Covid. I am pleased with the progress our U.S. commercial team has made to get new contracts in place for fall 2023. We are on track to deliver 2023 sales between $6 billion to $8 billion, depending on Covid vaccination rates in the U.S.," said [Defendant] Bancel[.] "Our late-stage clinical pipeline is firing on all cylinders with four infectious disease vaccines in Phase 3, including RSV which was recently submitted to regulators for approval. Our individualized neoantigen therapy is now in Phase 3 for melanoma and our lead rare disease program for PA is in dose confirmation. We believe that all these products should launch in 2024, 2025 or 2026, and we are continuing to invest in scaling Moderna to bring forward an unprecedented number of innovative mRNA medicines for patients."

99.    The same day, the Company hosted an earnings call with analysts and investors to discuss Moderna's 2Q23 financial results (the "2Q23 Earnings Call"). During the scripted segment of the call, Defendant Bancel stated, *inter alia*, that "[w]e've also started to manufacture mRNA-1345 in preparation for the launch. As a reminder, at launch, these products will be in a prefilled syringe presentation, ***which combined with the strong efficacy profile will position very well our product to healthcare professionals.***"

100.    Also during the scripted portion of the 2Q23 Earnings Call, Defendant Hoge stated

the following, in relevant part:

> Moving to RSV. As [Defendant Bancel] mentioned earlier, we are pleased to be on track for regulatory approvals in 2024. Earlier this month, we announced a rolling submission to the FDA, and we plan to use a priority voucher to accelerate that review. We also filed additional regulatory applications in Europe, Switzerland, Australia, and the UK. ***We're incredibly encouraged by the profile of mRNA-1345 and look forward to the expected commercial launch next year***.

***September 13, 2023 Press Release***

101.     On September 13, 2023, Moderna published a press release titled "Moderna Expands the Field of mRNA Medicine with Positive Clinical Results Across Cancer, Rare Disease, and Infectious Disease." In relevant part, the press release stated the following:

> **Expanding the Field of mRNA Medicine**
> Moderna was founded and built to use nature's information molecule, mRNA, to treat and prevent disease. The premise has always been that an mRNA-based approach to making medicine could advance at the pace of information, leveraging common science, technology, and infrastructure to create medicines addressing high unmet needs at unprecedented speed and efficiency.
>
> Through more than a decade of investment in science, the Company has created the field of mRNA medicine. The Company has advanced a diverse pipeline and demonstrated the potential for clinical benefit in cancer (mRNA-4157), in three different rare diseases (mRNA-3705, mRNA-3927, mRNA-3745), and multiple infectious disease vaccines (mRNA-1273, ***mRNA-1345***, mRNA-1010). The Company has advanced six programs into late-stage development, including two approved or filed for approval, and three more that have completed Phase 3 enrollment. The Company expects to double the number of programs in Phase 3 by 2025 and launch up to 15 products in five years across cancer, rare disease, and infectious disease. Up to four of those launches could come by 2025.

102.     In addition, the press release reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of ***83.7%*[.]**"

***November 2, 2023 Press Release***

103.     On November 2, 2023, the Company published a press release announcing Moderna's financial results for the third quarter of the 2023 Fiscal Year ("3Q23"). The press release again repeated that Mrna-1345 "met both its primary efficacy endpoints, with a vaccine

efficacy (VE) of *83.7%*" and further stated the following, in relevant part:

> *Moderna is preparing for the marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market*. The Company is encouraged by early indications of strong consumer awareness and demand in the RSV market. Moderna believes that clinical data for its RSV vaccine supports a best-in-class profile and that its ready-to-use pre-filled syringes (PFS) offer another competitive differentiator over currently licensed products, which require multiple preparatory steps by pharmacists and clinicians. Feedback from clinicians and customers in the COVID-19 market, where Moderna has a similar presentation, validates the benefits of PFS administration. The Company's pre-launch activities at this time are largely focused on scientific exchanges and public health engagements.

### December 14, 2023 Press Release

104. On December 14, 2023, Moderna published a press release titled "Moderna Announces New England Journal of Medicine Publication of Pivotal Phase 3 Clinical Safety and Efficacy Data For MRNA-1345, The Company's Investigational Respiratory Syncytial Virus (RSV) Vaccine." In relevant part, the press release stated the following:

> RSV is a highly contagious virus that causes severe disease across the age spectrum, including older adults. Each year in the U.S., RSV leads to approximately 60,000-160,000 hospitalizations and 6,000-10,000 deaths among older adults. Applications for mRNA-1345 have been submitted to regulators around the world. Moderna is actively preparing for an expected 2024 marketing launch of mRNA-1345 and believes its U.S. COVID-19 market share to date demonstrates the Company's ability to compete in the commercial market. If approved, mRNA-1345 would have a potential best-in-class profile and be the only ready-to-use RSV vaccine available in single-dose prefilled syringes.

### February 22, 2024 Press Release and Earnings Call

105. On February 22, 2024, the Company published a press release announcing Moderna's fourth quarter and full 2023 Fiscal Year financial results. The press release reiterated that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of *83.7%***[.]**"

106. The same day, the Company hosted an earnings call with analysts and investors to

discuss Moderna's fourth quarter and full 2023 Fiscal Year financial results (the "4Q23 Earnings Call"). Defendant Hoge spoke during a scripted portion of the call, stating the following, in relevant part:

> Moving to our RSV vaccine candidates, we are very excited about launching the RSV vaccine this year. That will be the launch of our second product. Our mRNA platform is delivering. The FDA PDUFA date is May 12. If the outcome is positive, we anticipate that ACIP will include mRNA-1345 on the agenda in late June.
>
> ***
>
> Let me now turn to our RSV vaccine profile. ***We believe we have the best profile to serve patients and completing the RSV market, efficacy, safety, and ease of use. Our clinical data shows strong vaccine efficacy***. We have a well-established safety and tolerability profile that leverages the same mRNA technology that has been delivered in over 1 billion COVID vaccines. Additionally, we have not seen any case of Guillain-Barre Syndrome or GBS in our Phase 3 trials.

### February 23, 2024 Form 10-K

107.    On February 23, 2024, the Company filed its annual report on Form 10-K with the SEC, reporting Moderna's financial and operating results for the fourth quarter and full 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Bancel, Mock, Afeyan, Berenson, Horning, Langer, Nader, Nabel, Sagan, and Tallett and contained SOX certifications signed by Defendants Bancel and Mock representing that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

108.    The 2023 10-K contained substantively similar descriptions of Moderna's strategy and overview of mRNA-1345 as discussed, *supra*, in ¶¶85-86.

### March 21, 2024 Proxy Statement

109.    On March 21, 2024, Moderna filed the 2024 Proxy Statement with the SEC. Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett, solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which

contained material misstatements and omissions.

110.    The 2024 Proxy Statement called for the Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Langer, Nabel, and Tallett to the Board; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; and (3) ratify the selection of EY as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2024 (the "2024 Fiscal Year").

111.    In a section titled "Board's Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> Our Board is responsible for overseeing risk management. It exercises its oversight primarily through its committees. The full Board or applicable committee discusses with management our major risk exposures, their potential impact, and the steps we take to manage them. The Board must satisfy itself that the risk management processes designed and implemented by management are adequate and functioning as intended. When a Board committee is responsible for evaluating and overseeing the management of a particular risk, the Chair of that committee reports on it to the full Board at regular meetings so the Board can coordinate the risk oversight role among the relevant parties. The Board's standing committees each having primary oversight for risks related to the areas set forth below.
> ***
> **Audit Committee**
>
> -   Ensuring the integrity of Moderna's financial statements and related disclosures.
> -   Maintaining effective internal control over financial reporting and policies relating to risk assessment and management.
> -   Mitigating exposure to major financial risks and taking steps to monitor and control such exposures, including overseeing treasury and tax operations.
> -   Strengthening our cybersecurity program and protection against other technology-related risks.
> -   Implementation of policies and procedures related to the receipt, retention and treatment of complaints regarding accounting, internal controls or auditing matters, and handling of whistleblower complaints.
> -   Ensuring that internal audit and compliance plans are aimed at identifying and mitigating key risks.

112.    In a section titled "Governance Documents," the 2024 Proxy Statement stated:

We have adopted a Code of Ethics and Business Conduct that applies to our Board

of Directors and all of our officers and employees. In addition, we have adopted Corporate Governance Guidelines that formalize certain fundamental board policies and practices. Both of these documents are available on the "Governance—Governance Documents" section of our Investor Relations website, https://investors.modernatx.com.

113. Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

114. The 2024 Proxy Statement was also false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

115. As a result of Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Langer, Nabel, and Tallett to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve, on a non-binding, advisory basis, the compensation paid to the Company's named executive officers; and (3) appoint EY as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

*March 27, 2024 Press Release*

116.     On March 27, 2024, Moderna published a press release titled "Moderna Advances Multiple Vaccine Programs to Late-Stage Clinical Trials." The press release again repeated the assertion that mRNA-1345 "met both its primary efficacy endpoints, with a vaccine efficacy (VE) of ***83.7%[.]***"

117.     The statements referenced in ¶¶80-86, 94-108, and 116 were materially false and misleading and/or failed to disclose, *inter alia*, that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

*May 31, 2024 Press Release*

118.     The truth began to emerge on May 31, 2024 when the Company published a press release "announc[ing] that the [FDA] has approved mRESVIA (mRNA-1345) . . . to protect adults aged 60 years and older from lower respiratory tract disease caused by RSV infection." However, the press release revealed for the first time ***a vaccine efficacy of only 78.7%***, which was significantly below the 83.7% vaccine efficacy rate that the Company had previously identified in its July 2023 BLA rolling submission to the FDA.

119.     Analysts responded negatively to this news, with *Reuters*, in an article titled "US FDA approves Moderna's RSV vaccine with lower-than-expected efficacy in its label," reporting the following, in relevant part:

> The U.S. Food and Drug Administration approved Moderna's (MRNA.O), opens new tab respiratory syncytial virus (RSV) vaccine, the company announced on

Friday, giving it a shot at much-needed new revenue from a second product.

Moderna's vaccine was approved for the prevention of RSV-associated lower respiratory tract disease in adults aged 60 or older, **_but with a label indicating the shot was 79% effective at preventing at least two symptoms of RSV, such as cough and fever_**.

Moderna had filed for FDA approval in July on data from a late-stage trial that showed its vaccine was 84% effective at preventing those symptoms, and its shares were down more than 6% in afternoon trading.

120.    On this news, the price per share of the Company's stock fell $8.94, or 5.9%, from a closing price of $151.49 on May 30, 2024 to close at a price of $142.55 on May 31, 2024.

121.    The truth fully emerged on June 26, 2024 when the Company presented before the CDC's Advisory Committee on Immunization Practices. During the presentation, the Company revealed that after 18 months, mRNA-1345 proved only 49.9% to 50.3% effective against multiple symptoms of lower respiratory tract disease, which fell significantly lower than the efficacy rate for vaccines produced by the Company's competitors.

122.    Analysts again responded negatively to these disclosures, with _Reuters_ reporting, in an article titled "Moderna says its RSV shot is 50% effective across a second season," the following, in relevant part:

Moderna [. . .] opens new tab respiratory syncytial virus (RSV) shot mRESVIA showed 50% efficacy in preventing RSV after 18 months, the drugmaker said on Wednesday.
In their clinical trials, GSK's RSV vaccine Arexvy was 78% effective in preventing severe RSV over a second year and Pfizer's was 78% effective through a second RSV season.

Moderna presented the data at a meeting of the U.S. Centers for Disease Control and Prevention's Advisory Committee on Immunization Practices. The drugmaker has previously cautioned against comparing its vaccine to rivals, noting that the trials were not head-to-head and used different case definitions for RSV disease.

123.    Similarly, in an article titled "Moderna RSV Vaccine Efficacy Sinks Over Time, CDC Documents Show," _Bloomberg_ reported the following, in relevant part:

Moderna [. . .] shares sank after new data showed the efficacy of its RSV shot fell sharply in the second year and was lower than that of rival vaccines.

The results could further raise doubts over the prospects for its shot, which is already third to the market. Moderna shares fell as much as 11%, their biggest intraday decline since November.

Moderna's shot dropped from 55% efficacy over the first 12 months to 36% in the second year in patients with at least three "lower respiratory" symptoms of RSV, according to documents posted Wednesday on the Centers for Disease Control and Prevention website.

\*\*\*

Jefferies analyst Michael Yee said in a research note that Moderna's new figures were "on the lower end of expectations," while pointing out that comparisons were difficult because the companies studied their vaccines during different seasons.

124.    On this news, the price per share of the Company's common stock fell $15.15, or 11.01%, from a closing price of $137.60 per share on June 25, 2024 to close at a price of $122.45 per share on June 26, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

125.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $1.1 billion to repurchase approximately 8,048,761 shares of its own common stock at artificially inflated prices between January 2023 and June 2024.

126.    According to the Form 10-Q the Company filed with the SEC on May 4, 2023, between March 1, 2023 and March 31, 2023, the Company purchased 3,618,461 shares of its own common stock at an average price per share of approximately $145.31, for a total cost to the Company of approximately $525,798,568.

127.    As the Company's stock was actually worth only $122.45 per share, the price at closing on June 26, 2024, the Company overpaid by approximately $82,718,019 for repurchases of its own stock between March 1, 2023 and March 31, 2023.

128.    According to the Form 10-Q the Company filed with the SEC on August 3, 2023 ("2Q23 10-Q"), between April 1, 2023 and April 30, 2023, the Company purchased 2,702,957 shares of its own common stock at an average price per share of approximately $146.71, for a total cost to the Company of approximately $396,550,821.

129.    As the Company's stock was actually worth only $122.45 per share, the price at closing on June 26, 2024, the Company overpaid by approximately $65,573,737 for repurchases of its own stock between April 1, 2023 and April 30, 2023.

130.    According to the 2Q23 10-Q, between May 1, 2023 and May 31, 2023, the Company purchased 1,727,343 shares of its own common stock at an average price per share of approximately $132.90, for a total cost to the Company of approximately $229,563,885.

131.    As the Company's stock was actually worth only $122.45 per share, the price at closing on June 26, 2024, the Company overpaid by approximately $18,050,734 for repurchases of its own stock between May 1, 2023 and May 31, 2023.

132.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by ***$166.3 million***.

## DAMAGES TO MODERNA

133.    As a direct and proximate result of the Individual Defendants' conduct, Moderna has lost and expended, and will continue to lose and expend, many millions of dollars.

134.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

135.    Such expenditures include the ***$166.3 million*** that the Individual Defendants caused the Company to overpay for repurchases of its own stock while the stock price was artificially

inflated as a result of the false and misleading statements alleged herein.

136. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

137. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

138. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

139. As a direct and proximate result of the Individual Defendants' conduct, Moderna has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

140. Plaintiff brings this action derivatively and for the benefit of Moderna to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Moderna, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 10(b), 20(a), and 14(a)

of the Exchange Act.

141.    Moderna is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

142.    Plaintiff is, and has been at all relevant times, a shareholder of Moderna. Plaintiff will adequately and fairly represent the interests of Moderna in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

143.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

144.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Bancel, Afeyan, Horning, Nabel, Nader, Sagan, and Tallett (the "Director-Defendants") and non-party David M. Rubenstein (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

145.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, and, at the same time, to cause the Company to overpay by over $166.3 billion for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. This renders the Director-Defendants

unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

146. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Moderna to issue materially false and misleading statements. Specifically, the Director-Defendants caused Moderna to issue false and misleading statements which were intended to make Moderna appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

147. Additional reasons that demand on Defendant Bancel is futile follow. Defendant Bancel has served as the Company's CEO since October 2011 and as a Company director since March 2011. Defendant Bancel has received and continues to receive handsome compensation for his role as CEO and as a Company director. In addition, Defendant Bancel signed the false and misleading 2022 and 2023 10-Ks (and the SOX certifications contained therein) and solicited the false and misleading 2023 and 2024 Proxy Statements, which led to the reelection of various of the Director-Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director and the Company's highest officer, Defendant Bancel is personally responsible for all of the false and misleading statements alleged herein. He conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales made during the Relevant Period while the price of

the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. Defendant Bancel is also named as a defendant in the Securities Class Action. For these reasons, too, Defendant Bancel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148. Additional reasons that demand on Defendant Afeyan is futile to follow. Defendant Afeyan cofounded Moderna and has served as Chairman of the Company since 2012 and as a Company director since 2010. He also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Afeyan received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Afeyan signed the false and misleading 2022 and 2023 10-Ks and solicited the false and misleading 2023 and 2024 Proxy Statements, which led to the reelection of various of the Director-Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, his insider sales made during the Relevant Period while the price of the Company's stock was artificially inflated due to the misrepresentations discussed herein further demonstrate his motive in participating in the fraud. For these reasons, too, Defendant Afeyan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149. Additional reasons that demand on Defendant Horning is futile to follow. Defendant Horning has served as a Company director since 2020 and also serves as the Chair of

the Product Development Committee and as a member of the Science and Technology Committee and the Nominating and Corporate Governance Committee. Defendant Horning received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Horning signed the false and misleading 2022 and 2023 10-Ks and solicited the false and misleading 2023 and 2024 Proxy Statements, which led to the reelection of various of the Director-Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Horning breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

150. Additional reasons that demand on Defendant Nabel is futile follow. Defendant Nabel has served as a Company director since 2015 and also serves as the Chair of the Science and Technology Committee and as a member of the Compensation and Talent Committee and the Product Development Committee. Defendant Nabel received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Nabel signed the false and misleading 2022 and 2023 10-Ks and solicited the false and misleading 2023 and 2024 Proxy Statements, which led to the reelection of various of the Director-Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties

to protect corporate assets. For these reasons, too, Defendant Nabel breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

151. Additional reasons that demand on Defendant Nader is futile to follow. Defendant Nader has served as a Company director since 2019. He also serves as the Chair of the Compensation and Talent Committee and as a member of the Product Development Committee and the Science and Technology Committee. Defendant Nader received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Nader signed the false and misleading 2022 and 2023 10-Ks and solicited the false and misleading 2023 and 2024 Proxy Statements, which led to the reelection of various of the Director-Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Nader breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152. Additional reasons that demand on Defendant Sagan is futile to follow. Defendant Sagan has served as a Company director since 2018. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. Defendant Sagan received and continues to receive handsome compensation for his role as a Company director. In addition, Defendant Sagan signed the false and misleading 2022 and 2023 10-Ks and solicited the false and misleading 2023 and 2024 Proxy Statements, which led to the reelection of various of the Director-

Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sagan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Tallett is futile follow. Defendant Tallett has served as a Company director since 2020 and also serves as the Chair of the Audit Committee and as a member of the Compensation and Talent Committee. Defendant Tallett received and continues to receive handsome compensation for her role as a Company director. In addition, Defendant Tallett signed the false and misleading 2022 and 2023 10-Ks and solicited the false and misleading 2023 and 2024 Proxy Statements, which led to the reelection of various of the Director-Defendants to the Board, allowing them to continue breaching their fiduciary duties to the Company. As a trusted-long time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Tallett breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

154.    Additional reasons that demand on the Board is futile follow.

155.    Defendants Tallett (as current Chair) and Sagan (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were

responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

156.    All the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

157.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and

conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

158. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

159. The acts complained of herein constitute violations of fiduciary duties owed by Moderna's officers and directors, and these acts are incapable of ratification.

160. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Moderna. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Moderna, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a

recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

161.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Moderna to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

162.    Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### **FIRST CLAIM**
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

165.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

166.    Under the direction and watch of Defendants Bancel, Afeyan, Berenson, Horning, Langer, Nabel, Nader, Sagan, and Tallett, the 2023 and 2024 Proxy Statements failed to disclose that, contrary to the 2023 and 2024 Proxy Statements' descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct.

167.    The 2023 and 2024 Proxy Statements also failed to disclose that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

168.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 and 2024 Proxy Statements, including but not limited to, the reelection of Defendants Berenson, Horning, Sagan, Langer, Nabel, and Tallett to the Board.

169.    The false and misleading elements of the 2023 Proxy Statement led to, among other things, the reelection of Defendants Berenson, Horning, and Sagan to the Board, which allowed them to continue to breach their fiduciary duties to Moderna.

170.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the reelection of Defendants Langer, Nabel, and Tallett to the Board, which allowed them to continue to breach their fiduciary duties to Moderna.

171.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 and 2024 Proxy Statements.

172.    Plaintiff, on behalf of Moderna, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

173.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

174.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Moderna. Not only is Moderna now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Moderna by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Moderna.

175.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

176.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Moderna not misleading.

177.     The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

178.     By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

179.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.     The Individual Defendants, by virtue of their positions with Moderna and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Moderna and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Moderna to engage in the illegal conduct and practices complained herein.

181.     Plaintiff, on behalf of Moderna, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

182.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

183.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Moderna's business and affairs.

184.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

185.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Moderna.

186.     In breach of their fiduciary duties owed to Moderna, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) mRNA-1345 was less effective than Defendants had repeatedly represented to investors; and (2) due to the foregoing, the clinical and/or commercial prospects for mRNA-1345 were overstated. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

187.     Moreover, during the Relevant Period, while the Company's stock price was artificially inflated due to the foregoing misrepresentations, four of the Individual Defendants breached their fiduciary duties by selling shares of Company stock on inside information, for which they received combined total proceeds of ***over $326 million***.

188.     In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, thus rendering them personally liable to the Company

for breaching their fiduciary duties.

189. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

190. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

191. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Moderna's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

192. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

193. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Moderna has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

194. Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

195.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

196.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Moderna.

197.     The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Moderna that was tied to the performance or artificially inflated valuation of Moderna or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

198.     Plaintiff, as a shareholder and a representative of Moderna, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

199.     Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

200.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

201.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Moderna to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

202. In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

203. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

204. Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

205. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

206. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Moderna in a manner consistent with the operations of a publicly held corporation.

207. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Moderna has sustained and will continue to sustain significant damages.

208. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

209. Plaintiff, on behalf of Moderna, has no adequate remedy at law.

## EIGHTH CLAIM

**Against the Individual Defendants for Abuse of Control**

210. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Moderna, for which they are legally responsible.

212. As a direct and proximate result of the Individual Defendants' abuse of control, Moderna has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

213. Plaintiff, on behalf of Moderna, has no adequate remedy at law.

**NINTH CLAIM**
**Against Defendants Bancel, Mock, and Hoge for Contribution Under Sections 10(b) and 21D of the Exchange Act**

214. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

215. Moderna and Defendants Bancel, Mock, and Hoge are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Bancel's, Mock's, and Hoge's willful and/or reckless violations of their obligations as officers and/or directors of Moderna.

216. Defendants Bancel, Mock, and Hoge, because of their positions of control and authority as officers and/or directors of Moderna, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Moderna, including the wrongful acts

complained of herein and in the Securities Class Action.

217. Accordingly, Defendants Bancel, Mock, and Hoge are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

218. As such, Moderna is entitled to receive all appropriate contribution or indemnification from Defendants Bancel, Mock, and Hoge.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Moderna, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Moderna;

(c) Determining and awarding to Moderna the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Moderna and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Moderna and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Moderna to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Moderna restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: September 27, 2024

**THE BROWN LAW FIRM, P.C.**

*/s/ John Coyle IV*
John Coyle IV (BBO #714121)
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: jcoyle@thebrownlawfirm.net
        tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Roberto Medina, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26 __ day of September, 2024.

Roberto Medina